# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| JEFF S. PEARSON, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civ. No. 18-1137-LPS |
| | : | |
| ANDREW M. SAUL, Commissioner of | : | |
| Social Security Administration,[1] | : | |
| | : | |
| Defendant. | : | |

---

Jeff S. Pearson, Wilmington, Delaware.

    Pro Se Plaintiff

David C. Weiss, United States Attorney for the District of Delaware, Wilmington, Delaware.

Heather Benderson and Margaret W. Reed, Special Assistant United States Attorneys, Office of the General Counsel, Philadelphia, Pennsylvania.

Eric P. Kressman, Regional Counsel, and M. Jared Littman, Assistant Regional Counsel, Office of the General Counsel, Social Security Administration, Philadelphia, Pennsylvania.

    Attorneys for Defendant

## MEMORANDUM OPINION

March 16, 2020
Wilmington, Delaware

---

[1] Andrew Saul was sworn in as the Commissioner of Social Security on June 17, 2019. Pursuant to Federal Rule of Civil Procedure 25(d), Andrew Saul is substituted for Nancy A. Berryhill, Acting Commissioner of Social Security, who was named as the defendant in this suit.

STARK, U.S. District Judge:

## I.    INTRODUCTION

Plaintiff Jeff S. Pearson ("Pearson" or "Plaintiff"), who appears *pro se*,[2] appeals the decision

of Defendant Andrew M. Saul, Commissioner of Social Security ("the Commissioner" or

"Defendant"), denying his for application for a period of disability and disability insurance benefits

("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-34.  The Court has jurisdiction

pursuant to 42 U.S.C. § 405(g).

Pending before the Court are the parties' cross-motions for summary judgment.  (D.I. 12,

14)  Plaintiff seeks reversal and an award of benefits or, in the alternative, remand for consideration

of additional medical evidence.  (D.I. 137 at 9)  The Commissioner requests that the Court affirm

the decision denying Plaintiff's claim for DIB.  (D.I. 15 at 20)  For the reasons stated below, the

Court will deny Plaintiff's motion for summary judgment and will grant Defendant's motion.

## II.    BACKGROUND

### A.    Procedural History

On March 17, 2011, Plaintiff filed an application for DIB benefits that was closed on

January 20, 2012, following Plaintiff's failure to appear at a requested administrative hearing on

January 12, 2012.  (D.I. 8-3 at 5-6)  On September 5, 2014, Plaintiff protectively filed a second Title

II application for DIB, alleging disability beginning on December 31, 2009 due to liver disease, high

blood pressure, lumbar disc herniation, and aseptic necrosis hip.  (D.I. 8-2 at 27; D.I. 8-5 at 4, 5; DI.

8-7 at 10)  The claim was denied on March 12, 2015 and, upon reconsideration, on July 21, 2015.

(D.I. 8-4 at 2-5, 7-11)  Plaintiff filed a request for hearing on July 27, 2015.  (D.I. 8-4 at 12-13)  On

---

[2] Plaintiff is a former practicing attorney.  (D.I. 8-7 at 11)

1

June 15, 2017, a hearing was held before an Administrative Law Judge ("ALJ"), at which Plaintiff and an impartial vocational expert ("VE") testified. (D.I. 8-2 at 42-82) On August 23, 2017, the ALJ issued his decision, finding that Plaintiff has the severe impairments of degenerative changes of the lumbar spine with disc herniation and right hip avascular necrosis, but was not disabled within the meaning of the Social Security Act. (*Id.* at 27-34) Plaintiff filed a request for review by the Appeals Council, which was denied on July 25, 2018, and the ALJ's decision became the final decision of the Commissioner. (D.I. 8-2 at 2-4)

On August 1, 2018, Pearson commenced this action, seeking judicial review of the ALJ's decision. (D.I. 2) Pearson moved for summary judgment on March 6, 2019 (D.I. 12) and the Commissioner filed a cross-motion for summary judgment on March 14, 2019 (D.I. 14).

**B.     Factual History**

Plaintiff has past relevant work as an attorney. In seeking DIB, Plaintiff asserted that he was unable to work because of his medical conditions. (D.I. 8-7 at 10) As an attorney, Plaintiff reported that he did research, prepared reports, met with clients, and attended court proceedings. (*Id.* at 24) He prepared his own meals, performed light cleaning and laundry, drove and went out alone, and shopped in stores. (*Id.* at 36-37) He reported that he could pay attention for one hour at a time and could finish what he started. (*Id.* at 39) He could do little or no lifting, no squatting or bending, could not walk or stand for any length of time, and found sitting uncomfortable. (*Id.*)

**1.     Medical History, Treatment, and Conditions**

Plaintiff's application states that he could no longer work because of his disability beginning December 31, 2009. (D.I. 8-5 at 4; 8-7 at 10) On September 23, 1994, when Plaintiff was 31, he was involved in a motor vehicle accident. (D.I. 8-15 at 21) When seen by Murray D. Robinson M.D. ("Dr. Robinson") on October 24, 1994, Plaintiff's symptomatology was that of a traumatic disc herniation at L4-5 and L5-S1, resulting from the motor vehicle accident. (*Id.*) Plaintiff was

2

treated conservatively with rest, analgesics, and muscle relaxants. (*Id.*) A December 29, 1994 MRI of the lumbar spine revealed stable findings but indicated degenerative changes and disc herniation. (D.I. 8-9 at 2, 3) Plaintiff was reevaluated in November 1995, having completed epidural steroid injections without significant relief. (*Id.* at 20) In January 1996, Plaintiff was referred for evaluation for possible percutaneous discectomy, with the referral noting that a recent MRI demonstrated a right central to right sided disc herniation at L4-L5 along with disc degeneration at L5-S1. (*Id.* at 19) Years later, on April 17, 2003, Plaintiff saw Dr. Robinson and related doing well since his last visit until approximately two weeks prior, when he had recurrent severe back pain radiating into the right leg. (*Id.* at 18) A February 2002 MRI revealed mild progression of degenerative changes when compared with prior films from 1994 and 1995. (*Id.*) Plaintiff was prescribed Vicoprofen, and Dr. Robinson recommended that Plaintiff consider another series of epidural steroid injections. (*Id.*)

A November 19, 2010 hip x-ray report stated that the appearance of an abnormal femoral head suggested it may represent an area of aseptic necrosis and that an MRI might be helpful. (D.I. 8-9 at 4)

In August 2013, Plaintiff presented at Christiana Care with complaints of chest pain, subsequently assessed as secondary to alcohol withdrawal syndrome. (D.I. 8-9 at 5-52) Upon admission, Plaintiff reported that he "ambulates well without any support" and was "active with all activities of . . . daily living." (*Id.* at 51) A September 23, 2013 examination by Gaurav Jain, M.D. ("Dr. Jain") found Plaintiff had a normal gait, normal motor strength, normal sensory, and normal coordination. (*Id.* at 55) Plaintiff was assessed with abnormal liver enzymes. (*Id.*) Plaintiff was seen by Stephen Boone, M.D. ("Dr. Boone") on September 3, 2013, with complaints of right hip and left leg pain. (D.I. 8-10 at 52) Plaintiff provided a "long history of lumbar back pain 2/2 L4/L5 disc herniation as well as right hip aseptic necrosis. Since the early 1990s he has been seeing orthopedic, pain management and other physicians and has essentially been on pain medicine for the past twenty

3

years. He has also received epidural injections in the past." (*Id.* at 53) Plaintiff reported that he had taken no pain medication for six months to a year, because his physician had moved, and, since then, drank heavily to ease his pain. (*Id.*) When Plaintiff was seen by Dr. Boone on November 5, 2013, he reported that he usually walked unassisted, occasionally used a cane, and his pain had improved with a newly-prescribed pain medication. (*Id.* at 49)

On February 4, 2014, Plaintiff presented to R. Bruce Lutz, M.D. ("Dr. Lutz") with complaints of right hip pain relieved by prescribed medication and rest. (*Id.* at 2) Plaintiff stated that the pain radiated to the lumbar spine. (*Id.*) Medical notes indicate that Plaintiff had a history of lumbar disc problems but was "currently not needing treatment for back." (*Id.*) Dr. Lutz referred Plaintiff to James Zurbach, M.D. ("Dr. Zurbach") who recommended a right hip replacement due to right hip osteoarthritis. (*Id.* at 4-6) Plaintiff underwent right hip replacement on August 28, 2015. (D.I. 8-11 at 35-64) In post-operative notes, Plaintiff reported rare pain and, one month following surgery, Plaintiff reported that he was "biking with no issue." (D.I. 8-13 at 11, 13) Physical therapy was not needed. (*Id.* at 13)

On July 7, 2015, Plaintiff was evaluated by Dr. Zurbach for moderate to severe left hip pain. (D.I. 8-13 at 6) Plaintiff provided a history of gradual onset of left hip pain for approximately four years. (*Id.*)

Plaintiff was seen by Dr. Zurbach on December 8, 2015, with complains of lumbar spine pain and numbness. (D.I. 8-12 at 14) Plaintiff stated the symptoms were chronic, traumatic, and occurred constantly. (*Id.*) Plaintiff described the symptoms as moderate and the pain as sharp, piercing, and aching, but it did not radiate. (*Id.*) Plaintiff provided a history that his last lower back injection was seven to eight years earlier and physical therapy about ten years ago, with no relief. (*Id.* at 16) A December 2015 MRI showed mild to moderate disc bulging. (*Id.* at 40-41) Plaintiff was

4

assessed with lumbar stenosis, lumbar radiculitis, and lumbar pain. (*Id.* at 16) The plan was to refer Plaintiff to physical therapy. (*Id.*)

Plaintiff underwent left hip replacement surgery in January 2016. (D.I. 8-11 at 57-58) When he was seen on December 13, 2016, Plaintiff reported that he was doing well, felt stable, denied sharp pain or dysfunction, and had achy pain with increased use. (D.I. 8-15 at 10)

## 2.    Medical Consultants and Assessments

On January 5, 2012, Louise M. Diehl, CRNP ("Diehl") completed a medical source statement of ability to do work-related activities (physical). (D.I. 8-15 at 24-28) Diehl indicated that Plaintiff could frequently lift/carry up to 10 pounds and occasionally lift/carry up to 20 pounds. (*Id.* at 24) Diehl determined that Plaintiff was limited to sitting for one hour at a time for a total of six hours in an eight-hour workday, and standing/walking for 20 minutes at a time for a total of two hours in an eight-hour workday. (*Id.*) Diehl noted that Plaintiff used a cane to ambulate and the cane was medically necessary. (*Id.*) Diehl determined that Plaintiff could perform activities like shopping; travel without a companion for assistance; ambulate without a wheelchair or 2 canes; use public transportation; prepare a simple meal and feed himself; care for his personal hygiene; and sort, handle, and use paper/files. (*Id.* at 28) On May 10, 2012, Diehl prepared a medical certification that Plaintiff could not work any full-time job. (*Id.* at 31)

On March 11, 2015, State agency medical consultant, Darrin Campo, M.D. ("Dr. Campo") conducted an RFC assessment and concluded that, through Plaintiff's March 2013 date last insured, Plaintiff could occasionally lift 20 pounds and frequently lift 10 pounds and stand/walk 4 hours and sit about 6 hours in an 8-hour workday. (D.I. 8-3 at 19-23) On July 21, 2015, State agency medical consultant, Vinod K. Kataria, M.D. ("Dr. Kataria") reviewed Plaintiff's file and affirmed Dr. Campo's findings. (*Id.* at 300-10)

5

On December 13, 2016, Dr. Zurbach completed a form for Plaintiff to obtain a disability parking ID placard and checked boxes on the form that Plaintiff was severely limited in his ability to walk. (D.I. 8-14 at 22-23)

On December 27, 2016, Brian Perry, M.D. ("Dr. Perry") completed a Division of Social Services health assessment form and concluded that Plaintiff was unable to work for 12 months or more because of his back and hip conditions. (*Id.* at 20-21) Dr. Perry opined that Plaintiff was limited to lifting 15 pounds and could not sit or stand up to four hours, but he was able to complete his daily living activities independently. (*Id.* at 21)

### 2. The Administrative Hearing

#### a. Pearson's Testimony

Plaintiff was born on October 16, 1963. (D.I. 8-2 at 52) He has a driver's license but does not drive much. (*Id.* at 53) He lives independently. (*Id.* at 52-53) Plaintiff, an attorney, testified that he closed his law practice in 2009-10 because he could no longer perform the work and "began to feel that [his] increasingly deteriorating physical condition" began to pose a danger to clients, that he might make a mistake, and that he was not providing "the proper zealous representation." (*Id.* at 55, 57) Plaintiff testified that all income post-2009 was for either fees based upon work he had performed in 2009 or earlier or referral fees from other attorneys for personal injury cases. (*Id.*)

Plaintiff testified that he was injured in a motor vehicle accident in 1994, had an MRI in 1995, and was able to tolerate the pain because he was a lot younger then. (*Id.* at 58) Plaintiff has taken pain medication, injections, physical therapy – everything. (*Id.* at 59) Plaintiff testified that he could not work due to intractable pain. (*Id.* at 57) He has advanced, non-operable spinal stenosis which is painful, back spasms, radiculopathy, and numbness radiating down his leg. (*Id.*)

Plaintiff has had three hip replacements and they have marginally improved the pain, but they are still quite painful. (*Id.*) The right hip surgery in 2014 went reasonably well, while the left

6

hip surgery in January 2016 had a longer period of recovery and then required a second implant. (*Id.* at 63-67)

Plaintiff testified that he began receiving mental health care in October 2016. (*Id.* at 75) He has been on Lexapro since November 2006.[3] (*Id.*)

The ALJ questioned Plaintiff about the time from from 2009 to 2013. Plaintiff testified that during this time, he could sit for 45-60 minutes and stand for 20 minutes at a time. (*Id.* at 67-69) He can walk one block, but not at a reasonable pace. (*Id.* at 69) With lifting, Plaintiff testified that he tries to keep it at ten pounds or less, and can occasionally lift up to 20 pounds. (*Id.* at 70)

### b.    Vocational Expert's Testimony

The VE was given a hypothetical of a 53 year-old person, with a college education, past work experience as an attorney, who can engage in sedentary exertion, cannot push or pull on leg controls, can occasionally climb ramps and stairs if there is a handrail, can never climb ladders, ropes, or scaffolds, cannot do any dangerous balances, can occasionally balance, stoop, kneel, crouch, and crawl, can have no more than occasional exposure to vibration, and cannot work around unprotected heights or dangerous unshielded machinery. (*Id.* at 78-79) The ALJ asked if such a person could perform Plaintiff's past work, either as he performed it, or as generally performed in the national economy. (*Id.* at 79) The VE responded that the hypothetical person would be capable of performing the past work as described by the DOT, but not as performed. (*Id.* at 79) Next, the ALJ asked if the VE's answer would change if the ALJ added that the person would need to alternate sitting or standing for comfort every 20 minutes to half-hour. (*Id.* at 79-80) The VE responded that her answer would not change. (*Id.* at 80) However, the ALJ testified that if the

---

[3] Plaintiff's DIB application does not claim disability due to mental health issues.

individual was off-task 15 percent of the workday or week, the individual could not perform any jobs. (*Id.* at 80) Finally, the VE testified that an individual who had the added limitation of a combination of sitting, standing, and walking over the course of an eight-hour workday of less than eight hours could not perform Plaintiff's past relevant or any other competitive work. (*Id.*)

## C.    The ALJ's Findings

On August 23, 2017, the ALJ issued the following findings (D.I. 8-2 at 27-41):

1.    The claimant last met the insured status requirements of the Social Security Act on March 31, 2013.

2.    The claimant did not engage in substantial gainful employment during the period from his alleged onset date of December 31, 2009 through his last insured date of March 31, 2013. (20 C.F.R. 404.1571 *et seq.*).

3.    Through the date last insured, claimant has the following severe impairments: degenerative changes of the lumbar spine with disc herniation and right hip avascular necrosis. (20 C.F.R. 404.1520(c)).

4.    Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525 and 404.1526).

5.    After careful consideration of the entire record, the ALJ found that, through the date last insured, the claimant had the residual functional capacity to perform a range of sedentary work as defined in 20 C.F.R. 404.1567(a) except he could not push and/or pull leg controls. He also had the following nonexertional limitations: occasionally climb ramps and/or stairs if a handrail was present; never climb ladders, ropes, or scaffolds; never perform dangerous balancing, such as on beams, but otherwise occasionally balance; occasionally stoop, kneel, crouch, and crawl; occasionally be exposed to vibration; and never work around unprotected heights or dangerous, unshielded machinery. Additionally the claimant needed to alternate between sitting and standing at 20 to 30 minute intervals throughout the workday.[4]

---

[4] Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. 20 C.F.R. § 404.1567(a).

6.    Through the date last insured, the claimant was capable of performing past relevant work as an attorney (DOT 110.107-010) as generally performed. This work did not require the performance of work-related activities precluded by the claimant's residual functional capacity. (20 C.F.R. 404.1565).

7.    The claimant was not under a disability, as defined in the Social Security Act, at any time from December 31, 2009, the alleged onset date, through March 31, 2013, the date last insured. (20 C.F.R. 404.1520(f)).

## III.    LEGAL STANDARDS

### A.    Motion for Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.10 (1986). A party asserting that a fact cannot be – or, alternatively, is – genuinely disputed must be supported either by citing to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motions only), admissions, interrogatory answers, or other materials," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) & (B). If the moving party has carried its burden, the nonmovant must then "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587 (internal quotation marks omitted). The Court will "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

To defeat a motion for summary judgment, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at

586-87; *see also Podohnik v. U.S. Postal Service*, 409 F.3d 584, 594 (3d Cir. 2005) (stating party opposing summary judgment "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue") (internal quotation marks omitted). However, the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment;" a factual dispute is genuine only where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (stating entry of summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial").

### B.    Review of the ALJ's Findings

The Court must uphold the Commissioner's factual decisions if they are supported by "substantial evidence." *See* 42 U.S.C. § 405(g); *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). Regardless of "the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high." *Biestek v. Berryhill*, __U.S.__, 139 S. Ct. 1148, 1154 (2019). Substantial evidence has been defined as "more than a mere scintilla." *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "It means – and means only – such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek*, 139 S. Ct. at 1154. The Commissioner's findings of fact, if supported by substantial evidence, are conclusive. 42 U.S.C. § 405(g); *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir. 1979). To determine whether a finding is supported by substantial evidence, however, the district court must review the record as a whole. *See* 5 U.S.C. § 706.

The Third Circuit has explained that "a single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence – particularly certain types of evidence (*e.g.*, that offered by treating physicians) – or if it really constitutes not evidence but mere conclusion." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983). Thus, the inquiry is not whether the Court would have made the same determination but, rather, whether the Commissioner's conclusion was reasonable. *See Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988).

In determining whether substantial evidence supports the Commissioner's findings, the Court may not undertake a de novo review of the Commissioner's decision and may not re-weigh the evidence of record. *See Monsour*, 806 F.2d at 1190. The Court's review is limited to the evidence that was actually presented to the ALJ. *See Matthews v. Apfel*, 239 F.3d 589, 593-95 (3d Cir. 2001). However, evidence that was not submitted to the ALJ can be considered by the Appeals Council or the District Court as a basis for remanding the matter to the Commissioner for further proceedings, pursuant to the sixth sentence of 42 U.S.C. § 405(g). *See Matthews*, 239 F.3d at 592. "Credibility determinations are the province of the ALJ and only should be disturbed on review if not supported by substantial evidence." *Gonzalez v. Astrue*, 537 F. Supp. 2d 644, 657 (D. Del. 2008) (internal quotation marks omitted). Where the ALJ's findings of fact are supported by substantial evidence, a court is bound by those findings, even if the court would have decided the factual inquiry differently. *See Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).

## IV.   DISCUSSION

### A.   Disability Determination Process

Title II of the Social Security Act, 42 U.S.C. § 423(a)(1)(D), "provides for the payment of insurance benefits to persons who have contributed to the program and who suffer from a physical

or mental disability." *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). A "disability" is defined for purposes of DIB as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. *See* 42 U.S.C. § 423(d)(1)(A). A claimant is disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A); *see also Barnhart v. Thomas*, 540 U.S. 20, 21–22 (2003).

In determining whether a person is disabled, the Commissioner is required to perform a five-step sequential analysis. *See* 20 C.F.R. § 404.1520; *Plummer v. Apfel*, 186 F.3d 422, 427-28 (3d Cir. 1999). If a finding of disability or nondisability can be made at any point in the sequential process, the Commissioner will not review the claim further. *See* 20 C.F.R. § 404.1520(a)(4).

At step one, the Commissioner must determine whether the claimant is engaged in any substantial gainful activity. *See* 20 C.F.R. § 404.1520(a)(4)(I) (mandating finding of nondisability when claimant is engaged in substantial gainful activity). If the claimant is not engaged in substantial gainful activity, step two requires the Commissioner to determine whether the claimant is suffering from a severe impairment or a combination of impairments that is severe. *See* 20 C.F.R. § 404.1520(a)(4)(ii) (mandating finding of nondisability when claimant's impairments are not severe). If the claimant's impairments are severe, the Commissioner, at step three, compares the claimant's impairments to a list of impairments that are presumed severe enough to preclude any gainful work. *See* 20 C.F.R. § 404.1520(a)(4)(iii); *Plummer*, 186 F.3d at 428. When a claimant's impairment or its equivalent matches an impairment in the listing, the claimant is presumed disabled. *See* 20 C.F.R.

§ 404.1520(a)(4)(iii). If a claimant's impairment, either singly or in combination, fails to meet or medically equal any listing, the analysis continues to steps four and five. *See* 20 C.F.R. § 404.1520(e).

At step four, the Commissioner determines whether the claimant retains the residual functional capacity ("RFC") to perform his past relevant work. *See* 20 C.F.R. § 404.1520(a)(4)(iv) (stating that claimant is not disabled if claimant is able to return to past relevant work); *Plummer*, 186 F.3d at 428. A claimant's RFC is "that which [the] individual is still able to do despite the limitations caused by his or her impairment(s)." *Fargnoli v. Halter*, 247 F.3d 34, 40 (3d Cir. 2001). "The claimant bears the burden of demonstrating an inability to return to [his] past relevant work." *Plummer*, 186 F.3d at 428.

If the claimant is unable to return to his past relevant work, step five requires the Commissioner to determine whether the claimant's impairments preclude him from adjusting to any other available work. *See* 20 C.F.R. § 404.1520(g) (mandating finding of nondisability when claimant can adjust to other work); *Plummer*, 186 F.3d at 428. At this last step, the burden is on the Commissioner to show that the claimant is capable of performing other available work before denying disability benefits. *See Plummer*, 186 F.3d at 428. In other words, the Commissioner must prove that "there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with [his] medical impairments, age, education, past work experience, and [RFC]." *Id.* In making this determination, the ALJ must analyze the cumulative effect of all of the claimant's impairments. *See id.* At this step, the ALJ often seeks the assistance of a VE. *See id.*

### B.    Issues Presented

Plaintiff raises the following issues: (1) whether the ALJ erred in holding that Plaintiff's claim did not meet or equal the criteria for a listed impairment under the Code of Federal Regulations;

(2) whether there is substantial evidence in the record to support the ALJ's determination of no disability; and (3) whether the ALJ erred in failing to apply the "treating physician rule" in his consideration of the medical evidence offered in support of disability. (D.I. 13 at 2) The Commissioner seeks summary judgment on the grounds that: (1) substantial evidence supports the ALJ's decision that Plaintiff was not disabled at the time his date last insured expired; (2) the period involving Pearson's subsequent deterioration in his condition is not before the Court; and (3) Plaintiff's conclusory arguments are without merit. (D.I. 15 at 12, 15)

### C.    Listed Impairments

Plaintiff contends that the ALJ erred in finding that he did not meet or equal the criteria for a listed impairment. Conversely, Defendant responds that the ALJ properly found that Plaintiff did not meet a listed impairment.

At Step Three of the sequential analysis, the ALJ considered Listings 1.04 and 1.02. The Listings streamline the decision-making process by identifying claimants whose impairments are so severe that they may be presumed to be disabled. *See* 20 C.F.R. § 404.1525(a). The Listings define impairments that would prevent a claimant from performing any gainful activity, not just substantial gainful activity, and, therefore, the medical criteria contained in the Listings are set at a higher level than the statutory standard for disability. *See Sullivan v. Zebley*, 493 U.S. 521, 532 (1990). Consequently, a claimant has the burden of proving a presumptively disabling impairment by presenting medical evidence that meets all of the criteria of a listed impairment or is equal in severity to all of the criteria for the most similar listed impairment. *See* 20 C.F.R. § 404.1526.

Plaintiff does not indicate which subsection he relies upon, but argues that "radiographic evidence established the avascular necrosis of his right hip by 2012 at the latest," that the limitations resulting from the combined effect of right hip and low back injuries were documented in a 2012 residual functional capacity form, and the form establishes the presence of physical findings for the

ALJ to make a finding of disability. (D.I. 13 at 4) Plaintiff's reliance upon avascular necrosis and the requirements of Listing 1.04 and 102 is misplaced. These Listings consider musculoskeletal impairments of the joint and spine as opposed to avascular necrosis, which is the death of bone tissue due to lack of blood supply.[5]

The ALJ considered Listing 1.04 and Listing 1.02 and explained that Plaintiff's conditions did not meet the criteria of either listing. (D.I. 8-2 at 30) To meet Listing 1.04 – disorders of the spine – Plaintiff must establish a disorder such as a herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, or vertebral fracture, resulting in compromise of a nerve root (including the cauda equina) or the spinal cord, in conjunction with criteria set forth in three additional subsections. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04 ¶¶ A through C. In considering Listing 1.04, the ALJ found that the record did not contain evidence of nerve root compression, spinal arachnoiditis or lumbar spinal stenosis that resulted in pseudoclaudication prior to the date last insured (i.e., March 31, 2013) and, therefore, Plaintiff did not meet the requirements for Listing 1.04.

In considering Plaintiff's right hip condition and Listing 1.02 – major dysfunction of a joint – the ALJ noted there was no evidence the condition resulted in the inability to ambulate effectively and, that in August 2013, approximately five months after the date last insured, Plaintiff ambulated normally and was active and independent in activities of daily living. (D.I. 8-2 at 30) The "B" criteria of Listing 1.02 requires the impairment to cause an "inability to ambulate effectively," 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.02, ¶¶ A., B, which is defined as an "extreme limitation of the

---

[5] Avascular necrosis is the death of bone tissue due to a lack of blood supply and can lead to tiny breaks in the bone and the bone's eventual collapse. *See* https://www.mayoclinic.org/diseases-conditions/avascular-necrosis/symptoms-causes/syc-20369859 (last visited Mar. 6, 2020).

ability to walk . . . that interferes with the individual's ability to independently initiate, sustain, or complete activities [that does not] permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities," 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00, ¶ B.2.b. In addition, the Regulations state that the inability to walk without the use of a walker or two crutches or two canes constitutes an inability to ambulate effectively, *id.* at 1.00(B)(2)(b)(2); the use of one cane to walk is not sufficient, *see, e.g., Jones v. Berryhill*, 681 F. App'x 252, 255 (4th Cir. 2017); *Bullock v. Commissioner of Soc. Sec.*, 277 F. App'x 325, 328 (5th Cir. 2007); *McCleave v. Colvin*, 2014 WL 4060030, at *9 (M.D. Pa. Aug. 15, 2014).

As discussed, the ALJ found that Plaintiff's hip condition did not meet the criteria of Listing 1.02. Plaintiff argues that in 2012, his limitations were documented by his physicians. Presumably Plaintiff refers to the medical source statement of ability to do work related activities prepared by Nurse Practitioner Diehl. (D.I. 8-15 at 24-28) Diehl's assessment, however, does not indicate that Plaintiff required two canes, as required under the Listing. Notably, contrary to Diehl's 2012 assessment, during a November 2013 office visit with Dr. Boone, Plaintiff indicated that he usually walked unassisted, occasionally used a cane, and Dr. Boone observed that Plaintiff walked without assistance during the office visit. (D.I. 8-10 at 49)

In his decision, the ALJ stated that he considered whether Plaintiff's impairments, both singly and in combination, met or medically equaled the requirements of any of the impairments set forth in Listing 1.04 and 1.02, and found they did not. Despite Plaintiff's arguments to the contrary, substantial evidence supports the ALJ's finding that Plaintiff did not meet the criteria for Listings 1.04 and 1.02.

### D.    Treating Physician Rule

Plaintiff argues that the application of the "treating physician rule" directs a finding of disability in his favor. Presumably, Plaintiff refers to the assessment of Nurse Practitioner Diehl.

16

The ALJ gave Diehl's January 2012 assessment limited weight and her May 2012 assessment minimal weight. (D.I. 8-2 at 32-33) Plaintiff also makes references to treating physicians Dr. Perry and Dr. Zurbach.

Where the "ALJ provide[s] sufficient reasons for the weight given to the evidence from each of the treating physicians," "in most cases a sentence or [a] short paragraph will 'probably suffice' to support an ALJ's decision." *Sponheimer v. Commissioner of Soc. Sec.*, 734 F. App'x 805, 807 (3d Cir. 2018). Under the Regulations, a nurse practitioner is not considered an "acceptable medical source," and falls within the category of "other sources" as defined by 20 C.F.R. 404.1513(d).[6] *See McGowan v. Astrue*, 2013 WL 693234 at *7 (E.D. Tenn. Feb. 8, 2013) (explaining that nurse practitioner may be relied upon to assess severity of impairments). "A treating source's opinion is not entitled to controlling weight if it is 'inconsistent with the other substantial evidence in [the] case record.'" *Scouten v. Commissioner Soc. Sec.*, 722 F. App'x 288, 290 (3d Cir. 2018) (alteration in original) (quoting 20 C.F.R. § 404.1527(c)(2)).

Although Diehl is not an "acceptable medical source within the meaning of the regulations, 20 C.F.R. 404.1513, the ALJ considered her assessments. In assigning her assessments less than controlling weight, the ALJ clearly explained his reasons. *See e.g., Salles v. Commissioner of Soc. Sec.*, 229 F. App'x 140, 148 (3d Cir. 2007). The ALJ afforded limited weight to Diehl's January 2012 assessment based on finding it was not support by other medical evidence, that there were no examination notes from Diehl during the relevant time-frame, other examination records contained

---

[6] For claims filed on or after March 27, 2017, a licensed advanced practice registered nurse, or other licensed advanced practice nurse with another title, for impairments within his or her licensed scope of practice and a licensed physician assistant for impairments within his or her licensed scope of practice, are an "acceptable medical source." *See* 20 C.F.R. § 404.1502(a)(7) and (8). Plaintiff filed his DIB claim on March 17, 2011.

findings of normal ambulation and a nontender lower back, and there was no record evidence of a medically determinable impairment regarding exposure to respiratory irritants and noise. (D.I. 8-2 at 32) In addition, the ALJ determined that Diehl's January 2012 assessment supported a finding that Plaintiff was limited in his capacities for lifting, carrying, sitting, standing, and walking. (*Id.* at 33)

The ALJ gave minimal weight to Diehl's May 2012 assessment that Plaintiff was unable to work at his usual occupation or another occupation on a full-time basis given that the assessment concerned an issued reserved for the Commissioner and did not provide any insight into Plaintiff's specific functional limitation. (*Id.*) It is well-established that "[t]he ALJ – not treating or examining physicians or State agency consultants – must make the ultimate disability and RFC determinations." *See Chandler v. Commissioner of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011) (citing 20 C.F.R. § 404.1527(e)(1)).

Plaintiff also argues that "dating right up until the present," his treating physicians have classified him as unable to do any work whatsoever in the national economy. (D.I. 13 at 6) The ALJ considered December 2016 statements from Dr. Perry and Dr. Zurbach, both of whom treated Plaintiff. However, he gave little weight to their statements because they were made several years after Plaintiff's date last insured (*i.e.*, March 31, 2013) and appeared to incorporate limitations caused by Plaintiff's left hip condition, which was not a medically determinable impairment during the period at issue. (D.I. 8-2 at 33)

The December 2016 statements regarding Plaintiff's condition were provided almost three years after the expiration of Plaintiff's insured status under Title II. Plaintiff last date insured was December 31, 2013 and, to be eligible for DIB benefits, he had to establish that he was disabled as of that date. *See* 42 U.S.C. § 423(a)(1)(A). Thus, the burden was on Plaintiff to establish, the existence, as of that date, of an impairment "that precluded [him] from performing substantial gainful activity for a continuous period of twelve months prior to the expiration of [his] insured

status." *Kelley v. Barnhart*, 138 F. App'x 505, 507 (3d Cir. 2005); *see also Perez v. Commissioner of Soc. Sec.*, 521 F. App'x 51, 54-55 (3d Cir. 2013). It is not disputed that Plaintiff had degenerative changes of the lumbar spine with disc herniation and right hip vascular necrosis prior to December 31, 2013. However, records from years later are not probative as to the limiting effects of his impairments while still insured, when those records incorporate and also rely a condition that was not a medically determinable impairment during the period at issue.

Accordingly, the ALJ did not err in affording limited weight to the statements of Dr. Perry and Dr. Zurbach.

### E. Substantial Evidence

Plaintiff contends the substantial evidence of record compels a finding of disability, while Defendant argues that substantial evidence supports the ALJ's decision that Plaintiff was not disabled at the time his date last insured expired.

Plaintiff makes several arguments to support his position that the ALJ's finding is not supported by substantial evidence. He contends the ALJ was "deficient in obtaining complete medical records." (D.I. 13 at 6; 16 at 3) Plaintiff asserts that there are records (including prescription records and a pain report) available from medical sources dating back to 2012 which establish a finding of disability under the regulations. (D.I. 13 at 7) In his reply brief, Plaintiff states that he used telemedicine and received a steady supply of narcotics for his condition, but does not know if the records exist. (D.I. 16 at 3) He contends that the administrative record from his first application for disability included records from Dr. Sharon Montes ("Dr. Montes") from June 2009 that document his complaints of muscle spasms and chronic low back pain, but they do not appear in the instant record, and it does not appear that they were considered by the ALJ. Plaintiff also indicates that the Commissioner did not make an effort to obtain medical records for treatment he received from Diehl.

19

The ALJ has a duty to develop the record. *See* 20 C.F.R § 404.1512(b)(1) ("Before we make a determination that you are not disabled, we will develop your complete medical history for at least the 12 months preceding the month in which you file your application."); *see Sims v. Apfel*, 530 U.S. 103, 111 (2000) (ALJ has "duty to investigate the facts and develop the arguments both for and against granting benefits"). In order to discharge the duty, the ALJ should "make every reasonable effort to help [the claimant] get medical evidence from [his or her] own medical sources and entities that maintain [his or her] medical sources evidence when [the claimant gives the SSA] permission to request the reports." 20 C.F.R. § 404 1512(b)(1). However, if there are no "obvious gaps" in the administrative record, the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim. *See Johnson v. Colvin*, 2013 WL 4517857, at *12 (D.N.J. Aug. 23, 2013) (citing *Rosa v. Callahan*, 168 F.3d 72, 79 n.5 (2d Cir. 1999)).

During the administrative hearing, Pearson had no objection to the admission into evidence of Exhibits B-1A through B-18F. (D.I. 8-2 at 45) The ALJ asked Pearson if he was aware of any additional evidence that was missing for the period in issue, to which Pearson responded there was a disk created in connection with his first claim and he would like the medical exhibits from the first claim to be a part of the record for the second claim. (*Id.*) The ALJ agreed to Pearson's request and made a note to admit all prior "F exhibits."[7] (*Id.* at 46-47) The medical exhibits from the first claim are found at Exhibits B-19F through B-24F and include medical records from Diehl. (*See* D.I. 8-2 at 40-41)

The administrative record does not contain the one-page Montes report, dated June 19, 2009, but it does contain medical records from Diehl. Despite the absence of the Montes report

---

[7] During the exchange, the ALJ and Pearson specifically discussed Diehl's May 10, 2012 medical certification, which is found at Exhibit B23F. (*Id.* at 46)

and what Plaintiff claims are additional Diehl records, there were no "obvious gaps" in the administrative record. Plaintiff, an attorney "who did a fair number of disability claims in his prior work experience," did not request assistance in securing additional medical records. Nor does the administrative record indicate that Plaintiff notified the ALJ or Appeals Council of any outstanding records. (*See* D.I. 8-2 at 48) Finally, while Plaintiff sought an extension of time to submit evidence or argument to the Appeals Council, the additional records he submitted did not speak to his medical condition but, instead, to foreclosure proceedings. (D.I. 8-2 at 7-23; D.I. 8-4 at 57)

As previously discussed, Plaintiff must establish the existence of an impairment that precluded him from performing substantial gainful activity for a continuous period of twelve months prior to the expiration of his insured status. *See Kelley v. Barnhart*, 138 F. App'x 507. Evidence postdating the expiration of a claimant's insured status may shed light on his condition during the insured period. *See Christenson v. Colvin*, 2013 WL 6440960, at *9 (W.D. Pa. Dec. 9, 2013) (citing *Reilly v. Office of Personnel Mgmt.*, 571 F.3d 1372, 1380-1383 (Fed. Cir. 2009)). Moreover, Plaintiff was not necessarily required to present documentary evidence predating the expiration of his insured status in order to establish his entitlement to Title II benefits. *Id.* (citing *Pollard v. Halter*, 377 F.3d 183, 193-94 (2d Cir. 2004)).

The final responsibility for determining a claimant's residual functional capacity is reserved to the Commissioner. *See Breen v. Commissioner of Soc. Sec.*, 504 F. App'x 96 (3d Cir. 2012) (citing 20 C.F.R § 404.1546(c)). The ALJ specifically stated that his decision is limited to Pearson's functional abilities and limitations between December 31, 2009 and March 31, 2013. His decision reflects that he considered medical evidence prior to December 31, 2009 and after March 31, 2013.

The ALJ considered the effects of Plaintiff's condition in relation to his ability to perform work, and found that Plaintiff has the severe impairments of degenerative changes of the lumbar spine with disc herniation and right hip vascular necrosis. The ALJ took note that Plaintiff has been

diagnosed with left hip osteoarthritis, but the condition was not diagnosed until February 2014, nearly one year after the date last insured and, therefore, it was not a medically determinable impairment during the relevant adjudicatory period.

The ALJ also noted that Plaintiff was diagnosed with hepatic cirrhosis after his date last insured and, even if present prior to the date last insured, there is nothing in the record to suggest it caused more than minimal functional limitations during the relevant period. The ALJ considered Plaintiff's other conditions of hypertension and alcohol abuse and found them to be non-severe impairments. The substantial evidence of record supports his finding that these conditions are non-severe impairments. The record does not suggest the conditions caused more than minimal functional limitations.

Moreover, it is clear in reading the ALJ's decision that he thoroughly reviewed Plaintiff's treatment history. Plaintiff argues that his lack of treatment and/or conservative care was the result of the inability to pay for medical care and does not equate to a lack of injury. He contends that once he began receiving treatment, the records considered by the ALJ prove the severity of his conditions. The ALJ discussed the minimal course of medical treatment during the relevant period compared with Plaintiff's allegations of completely disabling pain and other symptoms. As explained in his decision, the ALJ considered Plaintiff's subjective complaints of pain and reasonably determined that they were inconsistent with the record evidence. The ALJ determined that the RFC assessment is supported by the objective medical evidence and Plaintiff's course of medical treatment prior to his date last insured.

The ALJ noted that prior to the alleged onset date, an MRI of the lumbar spine revealed degenerative changes and disc herniation; also, Plaintiff underwent epidural steroid injections in the 1990's and other pain management for his condition and there is no evidence of additional injections for the back condition between the alleged onset date and date last insured. The ALJ took further

22

note that there was little to no evidence of any symptoms or limitations related to back impairment between the alleged onset date and date last insured. Plaintiff's back was nontender and, in February 2014, medical providers indicated that Plaintiff did not need treatment for his back condition.

The ALJ also noted Plaintiff's November 2010 report of ongoing right hip pain of approximately one year in duration and that a November 2010 x-ray revealed possible necrosis, as well as 2013 exam notes wherein Plaintiff complained of pain in the right thigh and groin. The ALJ noted, however, there was very little, if any, evidence of treatment for hip pain or other symptoms related to the condition during the relevant period, and the record indicates that Plaintiff ambulated well and was active in completing all activities of daily living. While there was hip deterioration, Plaintiff did not require hip replacement surgery until more than two years after his date last insured.

In assessing Plaintiff's physical RFC, as previously discussed, the ALJ afforded limited and minimal weight to the assessments of Diehl while also finding Diehl's opinion supported Plaintiff's limitations in his capacities for lifting, carrying, sitting, standing, and walking. The ALJ gave some, but not significant, weight to the opinions of the state agency medical consultants, compared the opinions to Diehl's assessments and Plaintiff's hearing testimony, and determined they revealed Plaintiff was more limited than suggested by the state agency consultants. The ALJ determined, however, that the state agency consultants' opinions were well supported to the extent they opined that Plaintiff can perform sedentary work. Finally, as previously discussed, the ALJ gave limited weight to the opinions of Drs. Perry and Zurbach as they were given several years after Plaintiff's last insured date and appeared to incorporate limitations caused by Plaintiff's later-arising left hip condition.

The substantial evidence of record supports the RFC assessment that Plaintiff can perform a range of sedentary work except he could not push and/or pull leg controls and has nonexertional limitations of can occasionally climb ramps and/or stairs if a handrail was present; never climb

23

ladders, ropes, or scaffolds; never perform dangerous balancing, such as on beams, but otherwise occasionally balance; occasionally stoop, kneel, crouch, and crawl; occasionally be exposed to vibration; and never work around unprotected heights or dangerous, unshielded machinery. Additionally, Plaintiff needed to alternate between sitting and standing at 20 to 30 minute intervals throughout the workday. Plaintiff argues that he would have been found disabled had the ALJ concluded his impairments caused him to be "off-task" for 15 percent of the workday as testified to by the ALJ in one of the alternative hypotheticals posed to him. However, the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause some symptoms, but the allegations concerning the intensity, persistence, and limiting effects of the symptoms were not entirely consistent with the medical and other evidence.[8] It is clear in reading the ALJ's decision that he thoroughly analyzed the medical evidence, considered the medical opinions, and appropriately relied upon the testimony of the VE in concluding that Plaintiff is capable of performing his past relevant work as an attorney.

Finally, Pearson refers to a finding by the U. S. Department of Education ("Department of Education"), effective November 23, 2018, approving Plaintiff's application for discharge of a federal student loan based upon his "total and permanent disability." (D.I. 16 at 5) Although findings by other agencies are not binding upon the Commissioner, the Third Circuit has stated that they are entitled substantial weight. *See Clark v. Barnhart*, 206 F. App'x 211, 214 (3d Cir. 2006) (citing *Lewis v. Califano*, 616 F.2d 73 (3d Cir. 1980)); 20 C.F.R. § 404.1504. In the instant case, the letter approving Plaintiff's application advised him that his "disability date" is the date the Department of Education received documentation of the notice of award of DIB or SSI benefits or the date

---

[8] On October 1, 2014, Plaintiff reported that his conditions affected his ability to concentrate, but he could pay attention for one hour at a time and could finish what he started. (D.I. 8-7 at 39)

Plaintiff's physician certified Plaintiff's discharge application, depending on the type of documentation Plaintiff provided to show that he is totally and permanently disabled. (D.I. 16-1 at 2) This information is not contained in the record. Moreover, the Department of Education's determination did not exist when Plaintiff filed his DIB application or when the Appeals Council affirmed the ALJ's decision, making it impossible for the ALJ to consider.

In light of the foregoing, the Court finds that substantial evidence supports the ALJ's ruling, including his evaluation of Plaintiff's RFC and conclusion that Plaintiff was not under a disability from the alleged onset date through the date last insured.

F.    **Sentence Six Remand**

Plaintiff also requests a Sentence Six Remand. (D.I. 13 at 7) Plaintiff contends that there are records available from medical sources dating back to 2012, including a comprehensive pain report and prescription records, which support a finding of disability under the Regulations and demonstrate Plaintiff was prescribed strong opioid pain medication. (*Id.*) Plaintiff contends that the records are available to submit but were not available at the time of the administrative hearing. (*Id.*)

Plaintiff contends a Sentence Six Remand is appropriate because he was recently awarded SSI benefits on December 2, 2019 and the ALJ's decision granting this award credits the opinions of Dr. Perry and Dr. Cynthia Wiles ("Wiles"), supporting a finding of disability predating the March 31, 2013 date of last insured. (D.I. 22 at 1-2) Plaintiff argues that that the opinion awarding SSI benefits fully supports Plaintiff's motion for summary judgment or at a minimum warrants a Sentence Six Remand to consider the supplemental evidence relied upon in awarding him SSI benefits and not considered by the ALJ in denying Title II DIB benefits.

When a claimant submits evidence arising after the ALJ's decision, that evidence cannot be used to challenge the ALJ's decision on the basis of substantial evidence. *See Matthews*, 239 F.3d at 594. Pursuant to 42 U.S.C. § 405(g), sentence six, this Court may order a remand based upon

evidence submitted after the ALJ's decision, but only if the evidence satisfies three prongs: (1) the evidence is new; (2) the evidence is material; and (3) there was good cause why it was not previously presented to the ALJ. *See id.* at 239 F.3d at 593. "[S]ixth-sentence remand is appropriate when the district court learns of evidence not in existence or available to the claimant at the time of the administrative proceeding that might have changed the outcome of that proceeding." *Sullivan v. Finkelstein*, 496 U.S. 617, 626 (1990). To be material, there "must be a reasonable probability that the new evidence would have changed the outcome" of the Commissioner's decision. *Beety-Monticelli v. Commissioner of Soc. Sec.*, 343 F. App'x 743, 747 (3d Cir. 2009) (quoting *Szubak v. Secretary of Health and Human Servs.*, 745 F.2d 831, 833 (3d Cir. 1984)).

Plaintiff does not meet the required prongs. Plaintiff has not established that the evidence he refers to is new or material. Indeed, many of the records he refers to addressed his condition prior to the date last insured and, therefore, were available at the time the ALJ issued his decision. Nor has Plaintiff established good cause for his failure to submit the evidence. Plaintiff provides no reason why it the records dating to 2012 were not provided to the ALJ or why they were not submitted with the request for review by the Appeals Council.

With regard to the award for SSI benefits, as discussed in the December 2, 2019 decision, the evidence relied upon by the ALJ dates from December 7, 2016 through June 13, 2019 and is not material to the DIB claim. (*See* D.I. 22 at 7-13; D.I. 22-1 at 3-9)[9] For evidence to be "material," it must "relate to the time period for which the benefits were denied, and . . . not concern evidence of a later-acquired disability or of the subsequent deterioration of the previously non-disabling condition." *Szubak v. Secretary of Health & Human Services*, 745 F.2d at 833.

---

[9] In reading the December 2, 2019 decision, it appears only one record was reviewed in both the DIB and SSI case: a December 7, 2015 lumbar spine MRI.

Plaintiff was denied DIB because he did not establish disability prior to his date last insured. As discussed, a claimant must be insured for benefits in order to obtain an award under Title II. *See* 42 U.S.C. § 423(a)(1)(A). However, the expiration of a claimant's insured status does not affect his eligibility for SSI benefits under Title XVI. *See Bowen v. Galbreath*, 485 U.S. 74, 76 (1988). Plaintiff successfully established the existence of a statutory disability beginning on March 19, 2018, the date of his SSI application. (*See* D.I. 22 at 12) Since Plaintiff's insured status under Title II had expired on March 31, 2013, he was only entitled to SSI benefits.

Plaintiff now contends the award of SSI benefits fully supports his claim for DIB. SSI benefits were awarded based upon the severe impairments of degenerative disc disease of the cervical and lumbar spine, bilateral neuropathy, degenerative joint disease of the left shoulder, and obesity. (D.I. 22 at 7) The medical records supporting Plaintiff's SSI claim postdate the expiration of his insured status by more than two and one-half years. Plaintiff's attempt to establish his entitlement to benefits under Title II by relying on evidence of a later-acquired disability or of the subsequent deterioration of his previously non-disabling condition is unavailing. *See Szubak v. Secretary of Health & Human Services*, 745 F.2d at 833; *see also May v. Barnhart*, 78 F. App'x 808, 813 (3d Cir. 2003).

Plaintiff has failed to carry his burden of demonstrating that a Sentence Six remand is warranted pursuant 42 U.S.C. § 405(g).

## V. CONCLUSION

For the foregoing reasons, the Court finds that the Commissioner's final decision was supported by substantial evidence. Accordingly, the Court will deny Plaintiff's motion for summary judgment (D.I. 12) and will grant Defendant's cross-motion for summary judgment (D.I. 14).

An appropriate Order will be entered.

27